AO 106A  (08/18)  Application for a Warrant by Telephone or Other Reliable Electronic Means

# UNITED STATES DISTRICT COURT
### for the
Southern District of California

| | |
|---|---|
| In the Matter of the Search of<br>*(Briefly describe the property to be searched<br>or identify the person by name and address)*<br><br>Google LLC host of<br>Telephone number 760-896-0320 and email address<br>luismorenocamacho56@gmail.com ("Target Account") | )<br>)<br>)<br>)<br>)<br>)<br>)    Case No. 26mj3425 |

## APPLICATION FOR A WARRANT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:

See Attachemnt A, incorporated herein by reference.

located in the _____ Northern _____ District of _____ California _____ , there is now concealed *(identify the person or describe the property to be seized)*:

See Attachment B, incorporated herein by reference.

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

☑ evidence of a crime;

❐ contraband, fruits of crime, or other items illegally possessed;

❐ property designed for use, intended for use, or used in committing a crime;

❐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 21 USC Secs. 952, 960 & 963 | Importation of Controlled Substances and Conspiracy to Import |

The application is based on these facts:

See Attached Affidavit, incorporated herein by reference.

☑ Continued on the attached sheet.

❐ Delayed notice of \_\_\_\_\_ days *(give exact ending date if more than 30 days:* _____ *)* is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

*Joseph P. Ford*
*Applicant's signature*

Joseph Ford, HSI Special Agent
*Printed name and title*

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by

_____ telephone _____ *(specify reliable electronic means)*.

Date: \_\_\_\_ May 22, 2026 \_\_\_\_

*Judge's signature*

City and state:   San Diego, California     Honorable Daniel E. Butcher, U.S. Magistrate Judge
*Printed name and title*

## AFFIDAVIT IN SUPPORT OF
## <u>APPLICATIONS FOR SEARCH WARRANTS</u>

I, Special Agent Joseph Ford, being first duly sworn, hereby depose and state as follows:

### <u>INTRODUCTION</u>

1. I make this affidavit in support of applications for search warrants for information associated with the following Google LLC (Google) accounts that are stored at premises owned, maintained, controlled, or operated by Google, an electronic communications service and/or remote computing service provider headquartered at 1600 Amphitheater Parkway, Mountain View, California 94043:

> Telephone number 760-896-0320, and email address luismorenocamacho56@gmail.com, believed to be used by Luis Moreno Camacho (**"Target Account"**);

as described further in Attachment A for items that constitute evidence of violations of federal criminal law, namely, distribution of federally controlled substances and conspiracy to do the same, in violation of Title 21, United States Code, Sections 952, 960 and 963, as described in Attachment B. This affidavit is made in support of applications for search warrants under Title 18, United States Code, Sections 2703(a), 2703(b)(1)(A), and 2703(c)(1)(A) to require Google to disclose to the United States copies of the information (including the content of communications) described in Section II of Attachment B. Upon receipt of the information, United States-authorized persons will review that information to locate the items described in Section III of Attachment B.

2. The facts set forth in this affidavit are based on my own personal knowledge; knowledge obtained from other individuals during my participation in this investigation, including other law enforcement officers who have personal knowledge of the events and circumstances described herein; my review of documents and reports related to this investigation; and information gained through my training and experience. Because this affidavit is submitted for the limited purpose of establishing probable cause in support of

the applications for search warrants, it does not set forth each and every fact that I or others have learned during the course of this investigation. Conversations are set forth below in substance unless noted. Dates, times, and amounts are approximate.

## BACKGROUND AND EXPERIENCE

3.     I have been employed as Special Agent with Homeland Security Investigations (HSI) since September of 2021. I am currently assigned to the HSI Assistant Special Agent in Charge office, in El Centro, California. I am a graduate of the Federal Law Enforcement Training Center in Glynco, Georgia. Prior to working for HSI, I was employed as a Supervising Gaming Agent for the Commonwealth of Massachusetts. My duties at this job included conducting investigations and audits related to gaming laws at Massachusetts casinos. Additionally, in this role I conducted investigations pertaining to money laundering at Massachusetts casinos.

4.     During my tenure with HSI, I have participated in the investigation of various narcotics trafficking organizations involved in the importation and distribution of controlled substances into and through the Southern District of California.  Through my training, experience, and conversations with other law enforcement officers experienced in narcotics trafficking investigations, I have gained a working knowledge of the operational habits of narcotics traffickers, in particular those who attempt to import narcotics into the United States from Mexico at Ports of Entry.

5.     Through the course of my training, investigations, and conversations with other law enforcement personnel, I am aware that it is a common practice for individuals involved in the distribution of federally controlled substances to work in concert with other individuals and to do so by utilizing cellular telephones and other portable communication devices to maintain communications with co-conspirators in order to further their illicit criminal activities. Drug traffickers often require the use of a telephone facility to negotiate times, places, schemes, and manners for importing federally controlled substances and for arranging the disposition of proceeds from the sales of controlled substances. The telephone enables drug traffickers to maintain contact with associates, suppliers, and

2

26mj

customers, often through messaging services, including but not limited to Google Duo, Google Messages, Google Hangouts, Google Meet, and Google Chat, as well as through the use of third-party communication applications. I also know that drug traffickers often create secondary phone numbers through applications, like Google Voice, for the purpose of making calls and sending messages to individuals that the user seeks to compartmentalize from their primary phone number. Additionally, I know that drug traffickers often document their illicit activities through photographs stored on their telephones. For example, traffickers often maintain photographs of, among others, narcotics, pay-and-owe ledgers, and money proceeds from the trafficking of controlled substances. I also know that traffickers often use location services, such as Maps and Waze (a traffic tracking service), to coordinate locations for meeting with co-conspirators, including to transfer cash representing the ill-gotten gains from the trafficking. I also know that much of the aforementioned data is often backed-up on virtual cloud-based services, such as those offered by Google.

## JURISDICTION

6.    This Court has jurisdiction to issue the requested warrants because it is "a court of competent jurisdiction" as defined by Title 18, United States Code, Section 2711. 18 U.S.C. §§ 2703(a), (b)(1)(A), & (c)(1)(A). Specifically, the Court is "a district court of the United States . . . that has jurisdiction over the offense being investigated." 18 U.S.C. § 2711(3)(A)(i).

## PROBABLE CAUSE

### *Arrest of MORENO with Drugs*

7. On February 28, 2026, at approximately 1958 hours, Luis MORENO Camacho, ("MORENO"), a Mexican citizen, applied for entry into the United States from Mexico through the Calexico, California East Port of Entry via vehicle primary lane number two. MORENO was the driver and sole occupant of a white 2015 Ford F-150 pickup truck ("the vehicle") bearing Arizona license plates.

//

3

8. During primary inspection operations, a Customs and Border Protection Officer (CBPO) received a negative Customs declaration from MORENO. MORENO stated he was traveling to Yuma, Arizona. A CBPO referred MORENO to secondary inspection after they found anomalies in the roof or gas tank area of the vehicle during the X-Ray scan while the vehicle was in pre-primary.

9. During secondary inspection operations, a Canine Enforcement Team was conducting secondary inspection operations when the Human and Narcotic Detection Dog alerted to the passenger side area of the vehicle. A CBPO operating the Z-Portal X-Ray machine detected anomalies in the roof area of the vehicle. Further inspection of the vehicle resulted in the discovery of 52 total packages concealed in a non-factory compartment inside the roof of the vehicle. One (1) of the packages contained a substance, a sample of which field-tested positive for the characteristics of methamphetamine, with a total approximate weight of 34.62 kilograms (76.32 lbs.).

### *MORENO's Post-Arrest Statement*

10. During a post-Miranda interview, MORENO denied knowledge that the narcotics were in the vehicle. MORENO stated he was traveling home to Yuma, Arizona. MORENO claimed that his neighbor in Mexicali, named "Rafa Higaraeda," had used MORENO's vehicle the prior night (February 27th). MORENO stated that Rafa needed to use the truck at around 10:00 P.M. on Friday night and needed the vehicle to drive a woman home. MORENO stated that the truck was returned to him on Saturday, February 28th at approximately 2:00 P.M. MORENO stated he was upset that Rafa took the vehicle for so long and Rafa was only supposed to borrow it for a short time. MORENO stated that he did not know what was in the vehicle or why he was stopped at Customs, but suspects that Rafa was responsible for why he was being questioned because Rafa was the last one to borrow his vehicle.

//

//

//

4

26mj3425

11. MORENO stated Rafa gave MORENO the vehicle about 3 months ago in exchange for MORENO working with Rafa on a farm near his house in Mexicali. MORENO said he thought it was a little strange that Rafa did not make him pay for the vehicle.

12. Luis Moreno Camacho was arrested and charged with a violation of Title 21, United States Code, 952 and 960, importation of a controlled substance.

### *Subsequent Investigation*

13. On March 6, 2026, J.R.D.M., Luis MORENO Camacho's wife, spoke to Agents and stated that MORENO Camacho drove a white truck. J.R.D.M. said that she did not know to whom the vehicle belonged, and denied knowing Rafa Higaraeda—the neighbor Defendant claimed had provided him the vehicle. J.R.D.M. also claimed that she had never been inside the vehicle and did not know the make or model of the white truck. Agents reviewed J.R.D.M.'s border crossing records and found that J.R.D.M. had crossed into the United States from Mexico in the white Ford F-150 with MORENO Camacho on January 28, 2026, February 5, 2026, and February 24, 2026.

14. On March 5, 2026, Homeland Security Investigations Special Agents obtained Arizona Department of Motor Vehicle records that indicated the white Ford F-150 ("the vehicle" is registered to Luis MORENO Camacho. MORENO Camacho received the vehicle from Lorenzo GUTIERREZ Gallardo. GUTIERREZ Gallardo released the vehicle on January 21, 2026, to MORENO Camacho. A few days later, on January 23, 2026, Defendant crossed the vehicle into the United States for the first time.

15. On August 5, 2024, a source of information (SOI#1) was arrested at the San Luis, Arizona (AZ) for attempting to cross 38.79 kilograms of methamphetamine through the San Luis, AZ Port of Entry. SOI#1 later stated to Agents the Lorenzo GUTIERREZ Gallardo recruited SOI#1 to transport the narcotics. This individual is believed to be the same individual that sold MORENO Camacho the white Ford F-150 ("the vehicle.")

//

//

5

*Seizure of the Phone Linked to the* **Target Account** *during MORENO's Arrest*

16. The CBPO who performed a secondary inspection of the Vehicle and inventoried all the property seized from MORENO and the Vehicle, seized a black Motorola cellular device. During his post-*Miranda* interview, MORENO was shown the black Motorola cellular device, confirmed the phone belonged to him, and stated the telephone number for this phone was 760-896-0320, *i.e.*, the telephone number associated with the **Target Account**.

17. On March 1, 2026, Luis Moreno Camacho signed a Department of Homeland Security Consent to Search Form for HSI Special Agents to search the contents of his cellular telephone. An HSI Calexico Certified Forensics Analyst (CFA) conducted a forensic extraction of Luis Moreno Camacho's telephone and Homeland Security Investigations Agent Joseph Ford examined the download from the CFA.

18. During an examination of the download provided for Luis Moreno Camacho's telephone, I confirmed that the telephone number associated with Luis Moreno Camacho's telephone, *i.e.*, the telephone number associated with the **Target Account**, was 760-896-0320. I also discovered that the username luismorenocamacho56@gmail.com was the User Account on Luis Moreno Camacho's telephone for Google.com. On March 5, 2026, Agents submitted a preservation request for the **Target Account**, and thus Agents believe that the **Target Account** will still have evidence pertaining to the smuggling event which occurred on February 28, 2026.

### *Background Concerning Google*

19. Google is a United States company that offers to the public through its Google accounts a variety of online services, including email, cloud storage, digital payments, and productivity applications, which can be accessed through a web browser or mobile applications. Google also offers to anyone, whether or not they have a Google account, a free web browser called Google Chrome, a free search engine called Google Search, a free video streaming site called YouTube, a free mapping service called Google Maps, and a free traffic tracking service called Waze. Many of these free services offer additional

6

functionality if the user signs into their Google account.

20.    In addition, Google offers an operating system (OS) for mobile devices, including cellular phones, known as Android. Users of Android devices are prompted to connect their device to a Google account when they first turn on the device, and a Google account is required for certain functionalities on these devices.

21.    When individuals register with Google for a Google account, Google asks users to provide certain personal identifying information, including the user's full name, telephone number, birthday, and gender. If a user is paying for services, the user must also provide a physical address and means and source of payment. Signing up for a Google account automatically generates an email address at the domain gmail.com. That email address is the log-in username for access to the Google account.

22.    In addition to the above, Google typically retains and can provide certain transactional information about the creation and use of each account on its system. Google captures the date on which the account was created, the length of service, log-in times and durations, the types of services utilized by the Google account, the status of the account (including whether the account is inactive or closed), the methods used to connect to the account (such as logging into the account via Google's website or using a mobile application), details about the devices used to access the account, and other log files that reflect usage of the account. In addition, Google keeps records of the Internet Protocol (IP) addresses used to register the account and accept Google's terms of service, as well as the IP addresses associated with particular logins to the account. Because every device that connects to the Internet must use an IP address, IP address information can help to identify which devices were used to access the Google account.

23.    Google advertises its services as "One Account. All of Google working for you." Once logged into a Google account, a user can connect to Google's full suite of services offered to the general public, including those described in further detail below.

24.    For example, Google provides email services (called Gmail) to Google accounts through email addresses at gmail.com which can be accessed, including through

a mobile application. Additional email addresses ("recovery," "secondary," "forwarding," or "alternate" email addresses) can be associated with the Google account by the user. Google preserves emails associated with a Google account indefinitely, unless the user deletes them.

25.     Additionally, Google provides several messaging services, including Duo, Messages, Hangouts, Meet, and Chat. These services enable real-time text, voice, and/or video communications and also allow users to send and receive text messages, videos, photos, locations, links, and contacts. Google may retain a user's messages if the user has not disabled that feature or deleted the messages, though other factors may also impact retention. Google does not retain Duo voice calls, though it may retain video or voicemail messages.

26.     Google also provides an address book for Google accounts through Google Contacts. Google Contacts stores contacts the user affirmatively adds to the address book, as well as contacts the user has interacted with in Google products. Google Contacts can store up to 25,000 contacts. Users can send messages to more than one contact at a time by manually creating a group within Google Contacts or communicate with an email distribution list called a Google Group. Users also have the option to sync their Android mobile phone or device address book with their account so it is stored in Google Contacts. Google preserves Contacts indefinitely unless the user deletes them. Contacts can be accessed from the same browser window as other Google products, such as Gmail.

27.     Additionally, Google offers a cloud-based photo and video storage service called Google Photos. Users can share or receive photos and videos with others. Google Photos can be trained to recognize individuals, places, and objects in photos and videos and automatically tag them for easy retrieval via a search bar. Users have the option to sync their mobile phone to Google Photos. Google preserves files stored in Google Photos indefinitely unless the user deletes them.

28.     Google also offers a map service called Google Maps which can be searched for addresses or points of interest. Google Maps can provide users with turn-by-turn

directions from one location to another using a range of transportation options (driving, biking, walking, etc.) and real-time traffic updates. Users can share their real-time location with others through Google Maps by using the Location Sharing feature. And users can find and plan an itinerary using Google Trips. A Google account is not required to use Google Maps, but if users log into their Google account while using Google Maps, they can save locations to their account, keep a history of their Google Maps searches, and create personalized maps using Google My Maps. Google stores Maps data indefinitely unless the user deletes it.

29. Additionally, Google collects and retains data about the location at which Google account services are accessed. This location data can derive from a range of sources, including GPS data, Wi-Fi access points, cell-site locations, geolocation of IP addresses, sensor data, user searches, and Bluetooth beacons within range of the device. According to Google, this location data may be associated with the Google account signed-in or registered to the device when Location Services are activated on the device and the user has enabled certain global settings for their Google account, such as Location History or Web & App Activity tracking. The data retained may be both precision location data, like latitude and longitude coordinates derived from GPS, and inferential location data, such as the inference that a Google account is in New York because it conducts a series of searches about places to eat in New York and directions from one New York location to another. Precision location data is typically stored by Google in an account's Location History and is assigned a latitude-longitude coordinate with a meter radius margin of error. Inferential data is stored with an account's Web & App Activity. Google maintains these records indefinitely for accounts created before June 2020, unless the user deletes it or opts to automatically delete their Location History and Web & App Activity after three or eighteen months. Accounts created after June 2020 auto-delete Location History after eighteen months unless the user affirmatively changes the retention setting to indefinite retention or auto-deletion at three months.

//

### ITEMS TO BE SEIZED

30.     Investigators know that individuals working with criminal organizations often use multiple communication platforms in furtherance of criminal activity, including to communicate and facilitate the offenses under investigation. Indeed, based on training and experience, investigators are aware that, in addition to telephone and text messaging services (*i.e.*, MMS and SMS), other communication platforms accessible through the telephone, like Duo, Messages, Hangouts, Meet, and Chat, and third-party communication applications, are also often used by drug traffickers to engage in their illegal activity. These communication services can be used to coordinate payments and meetings, conduct negotiations and other matters relating to the criminal scheme, and to send location data, photographs, audio files, and/or videos, concerning the criminal activity, all of which are available from Google as outlined above. Based on my training and experience, voicemails, audio files, photographs, videos, and documents also are often created and used in furtherance of criminal activity. Map searches and location data, which also are available from Google, also may show the presence at known stash locations or other significant locations. Thus, stored communications and files connected to the **Target Account** may provide direct evidence of the offenses under investigation. This evidence may establish the "who, what, why, when, where, and how" of the criminal conduct under investigation, thus enabling the United States to establish and prove each element or, alternatively, to exclude the innocent from further suspicion.

31.     Based on training and experience, investigators are aware that evidence of who was using the **Target Account** and from where, and evidence related to criminal activity of the kind at issue here, may be found in the files and records described in Attachment B and available from Google. For example, account activity, like internet searches, may provide relevant insight into an account owner's state of mind as it relates to the offenses under investigation, such as the owner's motive and intent to commit a crime (*e.g.*, communications indicating a plan to commit a crime) or consciousness of guilt (*e.g.*, deleting account information in an effort to conceal evidence from law enforcement).

226mj34256mj3425

Communications, contacts, photographs, internet searches, location information and other information that Google can produce related to the **Target Account** also can lead to the identification of co-conspirators and instrumentalities of the crimes under investigation, including addresses and/or vehicles used by the subjects of the investigation. And, the identification of apps downloaded from Google Play may reveal services used in furtherance of the crimes under investigation, such as services used to communicate with co-conspirators. Therefore, Google's servers are likely to contain stored electronic communications and information constituting evidence of the crimes under investigation.

32.    Google's servers also are likely to contain "user attribution" evidence. Such evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence. For example, subscriber information, device information, the data associated with the foregoing (such as location, date, and time information), photographs, videos, and audio files may be evidence of who used or controlled the **Target Account** at a relevant time. As an example, because every device has unique hardware and software identifiers, and because every device that connects to the Internet must use an IP address, IP address and device identifier information can help to identify which computers or other devices – and thereby which user(s) – likely accessed the **Target Account**. Such information also allows investigators to understand the geographic and chronological context of access, use, and events relating to the crimes under investigation.

## PROCEDURES FOR ELECTRONICALLY STORED INFORMATION

33.    Federal agents and investigative support personnel are trained and experienced in identifying communications relevant to the crimes under investigation. The personnel of Google are not. It would be inappropriate and impractical for federal agents to search the vast computer network of Google for the relevant account and then to analyze the contents of that account on the premises of Google. The impact on Google's business would be severe.

34.    Therefore, I request authority to seize all content from the **Target Account**, as described in Attachment B. In order to accomplish the objective of the search warrant

11

with a minimum of interference with the business activities of Google, to protect the rights of the subject(s) of the investigation, and to effectively pursue this investigation, authority is sought to allow Google to make a digital copy of the entire contents of the account subject to seizure, as described in Section II of Attachment B. The copy will be provided to me or to any authorized federal investigator. The copy will be forensically imaged, and the images will then be analyzed to identify communications and other data subject to seizure pursuant to Section III of Attachment B. Relevant data will be copied to separate media. The original media will be sealed and maintained to establish authenticity, if necessary.

35.    Analyzing the data to be provided by Google may require special technical skills, equipment, and software. It also can be very time-consuming. Searching by keywords, for example, often yields many thousands of "hits," each of which must be reviewed in its context by the examiner to determine whether the data is within the scope of the warrant. Merely finding a relevant "hit" does not end the review process. Certain file formats do not lend themselves to keyword searches. Keywords search text. Many common applications do not store data as searchable text. The data may be saved in a proprietary non-text format. And, as the volume of storage allotted by service providers increases, the time it takes to properly analyze recovered data increases dramatically.

36.    Based on the foregoing, searching the recovered data for the information subject to seizure pursuant to these warrants may require a range of data analysis techniques and may take weeks or even months. Keywords need to be modified continuously based upon the results obtained. The personnel conducting the examination will complete the analysis within **ninety (90) days** of receipt of the data from the service provider, absent further application to this Court.

37.    All forensic analysis of the imaged data will employ search protocols directed exclusively to the identification and extraction of data within the scope of the warrant(s). In my training and experience, narcotics traffickers may be involved in the planning and coordination of a trafficking event in the days and weeks prior to an event. Based on my

training and experience, it is also not unusual for individuals to attempt to minimize the amount of time they were involved in their trafficking activities, and for the individuals to be involved for weeks and months longer than they claim. Accordingly, I request permission to search the **Target Account** for data beginning on **Decemeber 21, 2025** (a month prior to Defendant receiving the vehicle on January 21, 2026), **up to and including March 6, 2026**, a week after the defendant crossed into the United States through the Calexico, California East, Port of Entry. Agents believe potential co-conspirators may attempt to contact the Defendant on the **Target Account** in the days following a smuggling attempt in an effort to track the obtain an update on the location of the narcotics and/or the successful delivery of the narcotics.

## PRIOR ATTEMPTS TO OBTAIN THIS EVIDENCE

38.    Prior attempts to obtain this evidence are limited to Luis Moreno Camacho's telephone download, as outlined above, associated with the **Target Account**.

## CONCLUSION

37.    Based on the forgoing, I request that the Court issue the proposed warrant.

*Joseph P. Ford*

Special Agent Joseph Ford

Homeland Security Investigations

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by telephone on this 22nd day of May, 2026.

*Daniel E. Butcher*

HONORABLE DANIEL E. BUTCHER

UNITED STATED MAGISTRATE JUDGE

13

# **ATTACHMENT A**

Google, LLC is an Internet Service Provider with its primary computer information systems and other electronic communications and storage systems, records and data located at 1600 Amphitheater Parkway, Mountain View, California 94043. Google, Inc. hosts the following electronic communication account that is the subject of this search warrant and application:

- Telephone number 760-896-0320, and email address luismorenocamacho56@gmail.com, believed to be used by Luis Moreno Camacho ("**Target Account**").

1

## ATTACHMENT B

**I.    Service of Warrant**

The officer executing the warrant shall permit Google LLC (Google), as custodian of the computer files described in Section II below, to locate the files and copy them onto removable electronic storage media and deliver the same to the officer.

**II.    Items Subject to Seizure from the ISP**

To the extent that the information described in Attachment A is within the possession, custody, or control of Google, regardless of whether such information is located within or outside of the United States, and including any emails, records, files, logs, or information that has been deleted but is still available to Google, Google is required to disclose to the government for each account or identifier listed in Attachment A the following information from **December 21, 2025**, up to and including **March 6, 2026**, unless otherwise indicated:

1.  All business records and subscriber information, in any form kept, pertaining to the **Target Account**, including:

   a.  Names (including subscriber names, user names, and screen names);

   b.  Addresses (including mailing addresses, residential addresses, business addresses, and email addresses, including alternate and recovery email addresses);

   c.  Telephone numbers, including SMS recovery and alternate sign-in numbers;

2

d. Records of session times and durations, and the temporarily assigned network addresses (such as Internet Protocol ("IP") addresses) associated with those sessions, including log-in IP addresses.

e. Telephone or instrument numbers or other subscriber numbers or identities, including any temporarily assigned network address, SMS recovery numbers, Google Voice numbers, and alternate sign-in numbers;

f. Length of service (including start date and creation IP) and types of service utilized;

g. Means and source of payment (including any credit card or bank account number); and

h. Change history.

2. All device information associated with the **Target Account**, including but not limited to, manufacture names, model numbers, serial number, media access control (MAC) addresses, international mobile equipment identifier ("IMEI") numbers, FCC ID numbers, Android IDs, and telephone numbers.

3. Records of user activity for each connection made to or from the **Target Account**, including, for all Google services, the date, time, length, and method of connection, data transfer volume, user names, source and destination IP address, name of accessed Google service, and all activity logs;

4. The contents of all emails associated with the **Target Account**, including stored or preserved copies of emails sent to and from the account, draft emails, and deleted emails; attachments; the source and destination addresses associated with each email; the size, length, and timestamp of each email; and true and accurate header

3

information including the actual IP addresses of the sender and recipients of the emails;

5. Any records pertaining to the user's contacts, including address books; contact lists; social network links; groups, including Google Groups to which the user belongs or communicates with; user settings; and all associated logs and change history;

6. Any records pertaining to the user's calendar(s), including Google Calendar events; Google Tasks; reminders; appointments; invites; and goals; the sender and recipients of any event invitation, reminder, appointment, or task; user settings; and all associated logs and change history.

7. The contents of all text, audio, and video messages associated with the **Target Account**, including Chat, Duo, Hangouts, Meet, and Messages (including SMS, MMS, and RCS), in any format and however initially transmitted, including, but not limited to: stored, deleted, and draft messages, including attachments and links; the source and destination addresses associated with each communication, including IP addresses; the size, length, and timestamp of each communication; user settings; and all associated logs, including access logs and change history.

8. The contents of all records associated with the **Target Account** in Google Drive (including Docs, Sheets, Forms, and Slides) and Google Keep, including: files, folders, media, notes and note titles, lists, applications, and other data uploaded, created, stored, or shared with the account including drafts and deleted records; third-party application data and backups; SMS data and device backups; the creation and change history of each record; accounts with access to or which previously accessed each record; any location, device, other Google service (such as Google

4

Classroom or Google Group), or third-party application associated with each record; and all associated logs, including access logs and IP addresses, of each record.

9. The contents of all media associated with the **Target Account** in Google Photos, including: photos, GIFs, videos, animations, collages, icons, or other data uploaded, created, stored, or shared with the account, including drafts and deleted records; accounts with access to or which previously accessed each record; any location, device, or third-party application data associated with each record; and all associated logs of each record, including the creation and change history, access logs, and IP addresses;

10. All maps data associated with the **Target Account**, including Google Maps and Google Trips, including all saved, starred, and privately labeled locations; search history; routes begun; routes completed; mode of transit used for directions; My Maps data; accounts and identifiers receiving or sending Location Sharing information to the account; changes and edits to public places; and all associated logs, including IP addresses, location data, and timestamps, and change history.

11. All Location History and Web & App Activity indicating the location between **Decemeber 21, 2025**, up to and including **March 6, 2026** at which time the account was active, including the source of the data, date and time, latitude and longitude, estimated accuracy, device and platform, inferences drawn from sensor data (such as whether a user was at rest, walking, biking, or in a car), and associated logs and user settings, including Timeline access logs and change and deletion history.

12. All payment and transaction data associated with the **Target Account**, such as Google Pay and Google Wallet, including records of purchases, money transfers, and all other transactions; address books; stored credit; gift and loyalty cards;

5

associated payment cards, including any credit card or bank account number, PIN, associated bank, and other numbers; and all associated access and transaction logs, including IP address, time stamp, location data, and change history.

13. All Internet search and browsing history, and application usage history, including Web & App Activity, Voice & Audio History, Google Assistant, and Google Home, including: search queries and clicks, including transcribed or recorded voice queries and Google Assistant responses; browsing history, including application usage; bookmarks; passwords; autofill information; alerts, subscriptions, and other automated searches, including associated notifications and creation dates; user settings; and all associated logs and change history.

14. All activity relating to Google Play, including downloaded, installed, purchased, used, and deleted applications; details of the associated device and Android ID for each application, medium, or file; payment transactions; user settings; and all associated logs, including IP addresses, timestamps, and change history.

15. All Google Voice records associated with the **Target Account**, including forwarding and other associated telephone numbers, connection records; call detail records; SMS and MMS messages, including draft and deleted messages; voicemails, including deleted voicemails; user settings; and all associated logs, including access logs, IP addresses, location data, timestamps, and change history.

## III.    Evidence to be Seized by the Government

The search of the data supplied by Google pursuant to this warrant will be conducted by Homeland Security Investigations as provided in the "Procedures For Electronically-Stored Information" section of the affidavit submitted in support of

this search warrant, and will be limited to evidence of violations of 21 U.S.C. Sections 952, 960, and 963, for the period of **Dacemeber 21, 2025**, up to and including **March 6, 2026**, and to the seizure of:

a.  Evidence indicating efforts to import methamphetamine, fentanyl, cocaine, or some other federally controlled substance from Mexico into the United States, or possess and/or transport with the intent to distribute federally controlled substances within the United States;

b.  Evidence indicating accounts, facilities, storage devices, and/or services–such as email addresses, IP addresses, and phone numbers–used to facilitate the importation of methamphetamine, fentanyl, cocaine, or some other federally controlled substance from Mexico into the United States, or possession and/or transportation with the intent to distribute federally controlled substances within the United States;

c.  Evidence indicating co-conspirators, criminal associates, or others involved in importation of methamphetamine, fentanyl, cocaine, or some other federally controlled substance from Mexico into the United States, or possession and/or transportation with the intent to distribute federally controlled substances within the United States;

d.  Evidence indicating travel to or presence at locations involved in the importation of methamphetamine, fentanyl, or some other federally controlled substance from Mexico into the United States, or possession and/or transportation with the intent to distribute federally controlled

substance within the United States, such as stash houses, load houses, or delivery points; and

e. Evidence indicating the identity of the user(s) of the **Target Account**, and any co-conspirators involved in the activities in III(a)-(d) above, including records that help reveal the whereabouts of such person(s);

f. Evidence that provide context to any communications or records described above, such as messages sent or received in temporal proximity to any relevant electronic communications and any electronic communications tending to identify users of the **Target Account**;

g. Evidence indicating how and when the email account was accessed or used, to determine the geographic and chronological context of account access, use, and events relating to the crime under investigation and to the email account owner; and

h. Evidence indicating the email account owner's state of mind as it relates to the crime under investigation.

8